# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

| | |
|---|---|
| BROWN'S CREW CAR OF WYOMING LLC, ) | Case No.: 2:08-cv-00777-RLH-LRL |
| Plaintiff, ) | **O R D E R** |
| ) | |
| vs. ) | (Objection to Magistrate's Order–#60; |
| ) | Motion for Summary Judgment–##64 & 65; |
| NEVADA TRANSPORTATION ) | Motion for Summary Judgment–#69) |
| AUTHORITY, a division of the Nevada ) | |
| Department of Business and Industry, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| IGNACIO GARIJO dba WINNEMUCCA CAB,) | |
| ) | |
| Intervenor. ) | |
| _____ ) | |

Before the Court is Intervenor Ignacio Garijo's **Objection to Magistrate's January 12, 2009, Order pursuant to Local Rule IB 3-1** (#60), filed January 14, 2009.  The Court has also considered Plaintiff Brown's Crew Car of Wyoming LLC's Opposition (#62), filed January 15, 2009.

Also before the Court is Plaintiff's **Motion for Summary Judgment** (#65), memorandum of points and authorities in support thereof (#64), and affidavit of John Bickerstaff

AO 72
(Rev. 8/82)

1    (#66), all filed February 2, 2009.  The Court has also considered Defendant Nevada Transportation

2    Authority's ("NTA") Opposition (#67) and Garijo's Opposition (#68), both filed February 20,

3    2009; and Plaintiff's Reply (#71), filed March 6, 2009.

4         Also before the Court is Garijo's **Fed. R. Civ. P. 56(c) Motion for Summary**

5    **Judgment** (#69), filed February 20, 2009.  The Court has also considered Plaintiff's Opposition

6    (#74), filed March 10, 2009, and Garijo's Reply (#75), filed March 24, 2009.

7    **BACKGROUND**

8         Brown's Crew Car of Wyoming, LLC ("Brown") is a motor carrier that provides

9    rail-crew transportation services for large rail carriers.

10        The Nevada Transportation Authority (the "NTA") is a division of the Nevada

11   Department of Business and Industry that regulates motor passenger transportation within the

12   State. The Legislature created the NTA "to promote safe, adequate, economical and efficient

13   service and to foster sound economic conditions in motor transportation;" "[t]o encourage the

14   establishment and maintenance of reasonable charges for … [i]ntrastate transportation by fully

15   regulated carriers;" and "[t]o discourage any practices which would tend to increase or create

16   competition that may be detrimental to the traveling and shipping public or the motor carrier

17   business within the State." Nev. Rev. Stat. § 706.151(c)–(e) (2007).

18        Ignacio Garijo operates a local taxi company in Winnemucca, Nevada.

19   **I. Rail-Crew Transportation**

20        Large rail carriers require rail-crew transportation services, in part, due to federal-

21   law and union-rule limitations on the number of hours railroad train crews may work. Rail crews

22   may reach their maximum number of "on duty" hours at any point along the rail line.

23   Consequently, railroads contract with motor carriers to transport on short notice "relief" crews to

24   the rail line to replace "exhausted" crews. The motor carriers also transport the exhausted crews

25   from the rail line to a railroad office facility or to overnight accommodations. This allows the

26   railroads to continue operating without undue delay.

AO 72
(Rev. 8/82)

1    Railroads also utilize rail-crew transportation services in other ways. For example,

2 motor carriers transport rail crews along the rail line to assist in train movements. The carriers

3 transport engineers from the train to upcoming switch points and then back after the train passes.

4 Or, if a train is stopped on a track intersected by a road, the carriers transport crews along the line

5 to reconnect the train. In other instances, railroads request assistance at rail yards.  The carriers

6 remain at the yard for an entire day, transporting crews back and forth from the train to the station

7 and from one part of the train to another.

8 **II. Brown's Services**

9    Brown is licensed by the Federal Motor Carrier Safety Administration ("FMCSA")

10 to transport charter passengers and their belongings over irregular routes in the continental United

11 States. Brown provides its services exclusively under contract with large railroad companies. It

12 does not solicit business from the public. Unlike a traditional taxi service, Brown does not operate

13 out of terminals or on predefined routes. Instead, Brown equips its vehicles with global-

14 positioning and wireless communications systems, and dispatches its vehicles, regardless of their

15 location, from a centralized operations center in Lexana, Kansas. Brown provides information

16 regarding the location of its vehicles to the railroads so that the railroads can plan out their

17 transportation requests. After completing a transportation request for a railroad, Brown's drivers

18 remotely upload the details of the trip to Brown's processing center in Spring, Texas.

19    Up until mid-October 2008, Brown operated in Nevada under contract with Union

20 Pacific Railroad. Under the contract, Brown provided on-demand transportation for Union

21 Pacific's Utah and Roseville service units. The service units are not defined by state borders: the

22 Utah service unit stretches from Ogden, Utah to Carlin, Nevada, and the Roseville service unit

23 extends from northern Nevada, through Winnemucca, Reno, and Sparks, to Roseville, California.

24 Brown's contract with Union Pacific governed all aspects of its services, including compensation

25 and safety practices, as well as requirements for public liability insurance and communications

26 technology.

AO 72
(Rev. 8/82)

### III. Proceedings Leading Up to This Action

In 1998, Brown filed an application with the NTA—then called the Transportation Services Authority—seeking permission to expand its operations into other areas of Nevada. In accordance with Nevada Administrative Code section 706.155, the NTA published notice of Brown's application. After Garijo objected, the NTA permitted him to intervene and present evidence in opposition to Brown's application. Garijo and Brown eventually settled the matter by agreeing that Brown would not operate in Winnemucca or Washoe County. Brown further agreed to notify Garijo if it sought to amend its operating authority in the future to include Winnemucca or Washoe County.

In 2004, Brown filed another application with the NTA to remove the Winnemucca and Washoe County restrictions. It did not notify Garijo of its application in accordance with the settlement agreement. The NTA published notice of the application, but Garijo did not learn of it and did not intervene. The NTA approved Brown's application.

In early 2006, RailCrew Xpress acquired Brown.

In May 2006, Garijo filed a petition for judicial review in Nevada's Sixth Judicial District Court in Humboldt County requesting the court revoke Brown's operating authority in Winnemucca and Washoe County. Garijo then filed a second action in state court in June 2006 against Brown for breach of contract.

In February 2007, Brown and its affiliates filed a petition with the Federal Motor Carrier Safety Administration ("FMCSA") asking the agency to issue a declaratory ruling that motor-carrier transportation of rail crews under contract with railroads is transportation wholly in interstate commerce and therefore subject only to FMCSA's registration requirements.

On January 15, 2008, in the Nevada judicial review case, the state court retroactively revoked Brown's operating authority in Winnemucca and Washoe County, effective November 29, 2007. One month later, in February 2008, Garijo moved the state court to find Brown in contempt for continuing to operate after its Nevada authority had been revoked. In

response to the contempt motion, Brown filed a motion with the state court arguing it did not violate the law because all its rail-crew transportation services are wholly in interstate commerce and not subject to NTA regulation.

Brown then sought an authoritative ruling that its transportation services were wholly interstate. It had already filed a petition with the FMCSA. Brown further filed an emergency application with the NTA to restore its authority. It then moved to dismiss its application on the ground that the NTA lacked jurisdiction over it because all its transportation services were wholly in interstate commerce. Lastly, Brown filed this action in federal court against the NTA seeking a declaration that all of its transportation is interstate and not subject to state jurisdiction.

On May 22, 2008, the FMCSA denied Brown's petition seeking a declaratory order. In its decision, the FMCSA stated it would not issue a declaratory order because the controversy did not have industry-wide significance. It made no determination as to the merits of Brown's petition.

On June 2, 2008, the state court held a hearing on Garijo's contempt motion. The judge acknowledged Brown's argument that all its transportation was interstate, but admonished Brown, "You better have some kind of judgment or law that tells me, at the time of the trial in this case, that [Brown] had a legal excuse not to comply because it was under interstate commerce." (Dkt. #17, Aff. of Scott Boyes Ex. L at 22:13–16.)

**IV. Proceedings in Federal Court**

Brown filed this action on June 16, 2008, against the NTA seeking (1) a declaration that the NTA lacks jurisdiction to regulate it because all of its transportation is interstate and (2) an injunction enforcing the declaration. After the NTA filed its answer, Brown moved for summary judgment. During the briefing period on Brown's motion, Garijo moved to intervene or be joined as a necessary party, to dismiss for improper venue, and for leave to conduct discovery. He later

AO 72
(Rev. 8/82)

1    moved to stay Brown's motion for summary judgment until after the Court decided his motion to

2    intervene.

3            The Court held a hearing on October 16, 2008. At the hearing, the Court allowed

4    Garijo to intervene and granted him three months to conduct limited discovery. It denied Brown's

5    motion for summary judgment without prejudice to refile the motion at the close of discovery.

6    Brown moved the Court to reconsider its decision allowing intervention and discovery, but the

7    Court denied the request.

8            On October 24, 2008, Garijo served Brown with his first set of interrogatories and

9    first request for production of documents. Brown responded one month later. Garijo believed,

10   however, that Brown's responses were inadequate. The parties attempted to resolve their dispute

11   via letters and a conference, but were unsuccessful. Ultimately, Garijo filed an emergency motion

12   to compel discovery. Brown opposed the motion on the ground that Garijo was seeking

13   information and documents that were irrelevant to the issues in this matter. On January 12, 2009,

14   Magistrate Judge Leavitt issued an order denying Garijo's motion. Garijo timely objected to Judge

15   Leavitt's order.

16           Following the close of discovery, Brown again moved for summary judgment. The

17   NTA opposed Brown's motion. Garijo also opposed Brown's motion, and filed his own motion for

18   summary judgment.

19                                   **DISCUSSION**

20   **I. Garijo's Objection to Judge Leavitt's Order**

21           Garijo objects to Magistrate Judge Leavitt's order denying his emergency motion to

22   compel discovery. In his motion, Garijo asked Judge Leavitt to compel Brown to fully respond to

23   his first set of interrogatories and first request for production of documents. He now contends

24   Judge Leavitt's denial of his motion "effectively precludes [him] from conducting discovery in this

25   matter, as permitted by the Court in its October 21, 2008, Order." (Dkt. #60, Objection 3:16–17.)

26

AO 72
(Rev. 8/82)

**A. Legal Standard**

"A district judge may reconsider any pretrial matter referred to a magistrate judge … where it has been shown that the magistrate judge's ruling is clearly erroneous or contrary to law." Local Rule IB 3-1; *see also* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). Thus, this Court reviews Judge Leavitt's legal conclusions de novo and his other determinations for clear error. *See Osband v. Woodford*, 290 F.3d 1036, 1041 (9th Cir. 2002).

**B. Garijo's Discovery Requests**

Garijo sought to compel responses to ten interrogatories (##3–8, 11, 13, 16, 17) and six requests for production of documents (##1, 2, 4, 5, 12, 13).

**1. Interrogatories 3–8**

In this first group of interrogatories, Garijo asked Brown to identify, from 2004[1] to the present, all of Brown's (a) employees in Nevada, (b) equipment, and (c) interstate and intrastate transportation routes. In addition, Brown was to describe all facts that support its contention that the transportation routes were not subject to the NTA's regulatory authority. (*See* Dkt. #60, Objection Ex. C ("Intervener's 1st Set of Interrogs.") at 4–5.)

Brown objected to the scope and relevance of the requests. As to its Nevada employees, Brown provided information for its former president Scott Boyes and its Winnemucca and Elko manager, Bonnie Munro, but declined to provide information about its drivers and dispatchers because, it argued, they "would be able to testify as to their individual experiences, but such individual experiences are not relevant to the overall nature of the interstate transportation." (Dkt. #60, Objection Ex. E ("Brown's Resps. to Intervener's 1st Set of Interrogs.") at 3:12–14.) With respect to its equipment, Brown referenced the Boyes Affidavit at paragraphs 15 and 16 to describe the number and types of vehicles "for the purpose of describing the general nature of its

---

[1]  Garijo sought to compel discovery only for the period from 2006 to the present because Brown's current owner—Rail Crew Xpress—did not acquire the company until 2006 and claimed in its response that it did not have information or documents prior to that time.

AO 72
(Rev. 8/82)

business," (*id.* at 4:16), but argued that further information was irrelevant because "[t]ransportation is either interstate or intrastate based on the nature of the transportation performed, not based on the characteristics of the vehicles owned by a motor carrier," (*id.* at 4:9–11). And as to its transportation routes, Brown responded that it "does not operate over 'transportation routes,' but rather operates each trip according to the individual request by the railroad and its need for service at the time the request is made," (*id.* at 4:23–5:1)—i.e. "irregular routes," (*see id.* at 5:1–6). It explained that the irregular-route nature of its business was described at paragraphs 14, 19, and 42 of the Boyes Affidavit. It further stated that while it did not believe any of its transportation was subject to economic licensing regulation by the NTA, it was subject to the same safety and insurance regulation as other interstate carriers operating in Nevada. (*Id.* at 6:10– 15.)

### 2. Interrogatories 11 & 13

In these two interrogatories, Garijo asked Brown why it  filed an application in 2008 to expand its NTA operating authority to include Winnemucca and Washoe County. (Intervener's 1st Set of Interrogs. 6:2–4.) It also sought the identity of the officer who decided to apply for the expanded authority. (*Id.* at 6:11– 15.)

Brown again objected based on relevance. It argued that whether "its transportation is properly characterized under appropriate legal precedent as 'interstate' under the Commerce Clause to the U.S. Constitution does not depend in any way on its reasons" for seeking NTA authority. (Brown's Resps. to Intervener's 1st Set of Interrogs. 8:2–4.) Notwithstanding its objection, Brown referenced paragraphs 52 and 60 of the Boyes Affidavit, which describe the circumstances under which the  application was filed, and identified John Bickerstaff and Scott Boyes as the individuals with knowledge. (*Id.* at 9:1–3.)

### 3. Interrogatories 16 & 17

In these last two interrogatories, Garijo asked Brown regarding its contract with Union Pacific. He first asked Brown to identify all witnesses with knowledge of whether the

1   contract required it to maintain NTA operating authority. (Intervener's 1st Set of Interrogs. 7:4–7.)

2   Garijo also asked Brown to explain why Union Pacific required it to obtain and maintain NTA

3   operating authority. (*Id.* at 7:9–12.)

4           In response to both interrogatories, Brown stated that Union Pacific did not require

5   it to obtain and maintain NTA operating authority. (Brown's Resps. to Intervener's 1st Set of

6   Interrogs. 10:12–13.) Rather, "Union Pacific required [Brown] to comply with all pertinent state

7   and federal passenger carrier licensing requirements, leaving to [Brown] the determination as to

8   what licensing requirements were pertinent." (*Id.* at 13–15.) Brown also identified John Bickerstaff

9   and Scott Boyes as knowledgeable individuals. (*Id.* at 15–16.)

10               **4. Requests for Production 1, 12, & 13**

11          In its first, twelfth, and thirteenth requests for production of documents, Garijo

12   asked Brown to produce all documents evidencing a relationship between it and Union Pacific,

13   (Dkt. #60, Objection Ex. D ("Intervener's 1st Req. for Produc. of Docs.") at 6:3–7), and all

14   communications between it and Union Pacific concerning on-call, irregular-route transportation of

15   train crews and their belongings between points and places in Nevada from 2004 to the present,

16   (*id.* at 8:12–9:2).

17          Brown objected because it felt the request was overly broad and burdensome. (Dkt.

18   #60, Objection Ex. F ("Brown's Resps. to Intervener's 1st Req. for Produc. of Docs.") at 2:17–18,

19   12:3–4, 13:2–3.) With respect to documents evidencing its relationship with Union Pacific, Brown

20   indicated that it had previously provided to Garijo in the state-court litigation a copy of the "Long

21   Haul, Yard, and Shuttle Transportation Services" agreement between it and Union Pacific. (*Id.* at

22   3:14– 20.) As to its communications with Union Pacific, Brown responded:

23          To the extent documents regarding "all communications" are sought, the request is
            overly burdensome, since as described, it would include, for example, every
24          communication between Brown's operational employees relating to each of the
            more than 8,400 trips shown on the list provided in Response to Request No. 4, as
25          well as other discussions among Brown's personnel regarding the performance of
            thousands of trips.
26

AO 72
(Rev. 8/82)

1    (*Id.* at 12:5–9.)

2                    **5. Requests for Production 2, 4, & 5**

3                    In Garijo's second, fourth, and fifth requests for production, he asked Brown to

4    produce all documentation related to the on-call, irregular-route transportation of train crews and

5    their personal belongings in Nevada that it provided to Union Pacific, including all documents

6    prepared by Brown's employees and all documents it received from the Railroad, from 2004 to the

7    present. (Intervener's 1st Req. for Produc. of Docs. 6:9–15, 22–26, 7:2–6.)

8                    Brown objected to the requests as overly broad and burdensome. (Brown's Resps.

9    to Intervener's 1st Req. for Produc. of Docs. 4:4–5, 5:20–22, 7:9–11.) Brown's further explained

10   why it believed the request was so unwieldy:

11               Since approximately January 1, 2007, communications relating to performance of
             transportation would have been almost exclusively electronic or oral. It is estimated
12           as a "rough" but good faith estimate that on an "average" day, there could be as
             many as 75 communications relating to Brown's transportation for the Union
13           Pacific, which would be approximately 27,000 communications each year (75 x 30
             x 12), relating only to specific requests for service.
14

15   (*Id.* at 4:10–15.) In response to the request, however, Brown "prepared a comprehensive list

16   showing what it reasonably believes are all individually requested trips operated by [Brown] to,

17   from, and/or between Nevada points under its Agreement with Union Pacific during the period on

18   January 1, 2007 through July 31, 2008." (*Id.* at 6:18–21.) Brown further revealed that during part

19   of that period, it also conducted a scheduled shuttle service between Ogden, Utah and Elko,

20   Nevada, and between Salt Lake City and Elko, Nevada that operated twice daily. (*Id.* 6:21–23.)

21                   **C. January 12, 2009, Order**

22                   Judge Leavitt summarily denied Garijo's motion. He wrote:

23               Given the narrow issue raised by this lawsuit, and accordingly the limited
             discovery period allowed by Chief Judge Hunt, together with the detailed
24           background information provided in the Boyes affidavit supporting plaintiff's
             summary judgment motion, the court finds that Garijo's written discovery requests
25           are irrelevant and conspicuously overly broad.

26   (Dkt. #56, Order 1:14–17.)

AO 72
(Rev. 8/82)

**D. Analysis**

Context matters. The issue before the Court is narrow: whether Brown's rail-crew transportation is wholly in interstate commerce and therefore subject exclusively to federal licensing under the Motor Carrier Act. Furthermore, Garijo's participation in this action must be understood. The Court permitted Garijo to intervene because of the NTA's apathetic defense. The NTA was not adequately representing Garijo's interest as an NTA-licensed provider of motor-passenger services in receiving the protections afforded by Nevada's motor-carrier regulatory scheme. *See* Nev. Rev. Stat. § 706.151(c), (e); *Arakaki v. Cayetano*, 324 F.3d 1078, 1084, 1086 (9th Cir. 2003). Within that context, the Court permitted Garijo to conduct discovery concerning Brown's factual representations in its motion for summary judgment—representations that the NTA seemed content not to challenge or even investigate. The Court limited discovery to 90 days without extensions because it anticipated that the parties would  only seek evidence material to the narrow issue at hand.

In reviewing Garijo's written discovery requests and his motion to compel, it is clear that he is seeking information well beyond the scope and purpose of this action. For example, Garijo's requests for an exhaustive listing of all of Brown's employees and an exhaustive production of every communication between Brown and Union Pacific have no relevance to the intrastate or interstate character of Brown's rail-crew transportation services performed only in Nevada. Instead, the requests appear calculated to needlessly increase the cost of litigation. In the Court's view, Brown's responses are adequate and appropriate given the circumstances. Accordingly, the Court discerns no error in Judge Leavitt's determination that "Garijo's written discovery requests are irrelevant and conspicuously overly broad." (Dkt. #56, Order 1:16– 17.) Judge Leavitt's January 12, 2009, order is therefore affirmed and Garijo's objection is overruled.

//

//

**II. Motions for Summary Judgment**

1           Brown and Garijo both move for summary judgment. Brown asks the Court to

2  declare all of its Nevada rail-crew services wholly in interstate commerce and therefore not subject

3  to NTA regulation. Garijo, on the other hand, asks the Court to dismiss the case as moot because

4  Brown lost its contract to provide rail-crew services for Union Pacific in Nevada. Because it could

5  affect this Court's power to hear the case, the Court first considers the issue of mootness.

6  **A. Mootness**

7           Garijo and the NTA both assert that because Brown lost its contract with Union

8  Pacific in October 2008 its claims are now moot. A claim is moot, and therefore non-justiciable,

9  "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in

10  the outcome." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 395 (1980) (quoting *Powell v.*

11  *McCormack*, 395 U.S. 486, 496 (1969)). A court, however, should exercise restraint before

12  dismissing a case as moot: it should do so "only if it [is] absolutely clear that the litigant no longer

13  [has] any need of the judicial protection that it sought." *Adarand Constructors, Inc. v. Slater*, 528

14  U.S. 216, 224 (2000). Thus this Court must focus on whether it can still grant Brown the relief it

15  seeks. *See Dream Palace v. County of Maricopa*, 384 F.3d 990, 1000 (9th Cir. 2004).

16           In its complaint, Brown asks the Court for a declaration that all of its rail-crew

17  transportation services are wholly in interstate commerce and therefore subject exclusively to

18  federal licensing under the Motor Carrier Act. (Compl. 18:15–16.) Brown also seeks a permanent

19  injunction barring the NTA from enforcing its licensing requirements against it. (*Id.* at 18:17–20.)

20  The Court must decide whether Brown retains a legally cognizable interest in the declaration and

21  injunction now that it is no longer operating in Nevada under contract with Union Pacific. In

22  making this determination, the Court is cognizant that the value of Brown's present interest need

23  not be the same as when it first brought its claim. As long as Brown retains some concrete interest

24  in the outcome of the litigation, its claims are not moot even if the value of the relief it seeks is

25  now substantially diminished. *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 559, 571

26  (1984).

In the Court's view, this case is similar to *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115 (1974). In that case, a local union went on strike against two affiliated corporations after collective bargaining failed to achieve a new employment agreement. During the strike, the president and CEO of the corporations brought suit in federal court against various state officials. In his complaint, the CEO alleged that the striking employees were receiving public assistance through the state's welfare programs. He asked the court to declare void the regulations allowing striking employees to receive public assistance because they interfered with the federal labor policy of free collective bargaining expressed in the Labor Management Relations Act of 1947 and the Social Security Act of 1935. He also sought an injunction precluding the state from giving benefits to the striking employees. During the pendency of the federal action, the employees voted to end the strike. Consequently, the court of appeals dismissed the case as moot. The Supreme Court granted certiorari on the issue of whether the case was moot in light of the strike's end. *Id.* at 117–21.

The Supreme Court held the case was justiciable. It recognized that the plaintiffs' request for injunctive relief was now moot in light of the strike's end, but it determined that the corporations still retained a legally cognizable interest in receiving the declaratory judgment. The Court reasoned that, notwithstanding the end of the strike, the state's policy continued to affect the corporations' rights. It found that the continuing validity of the state laws affected the parties' rights because the employees knew that public benefits would be available to them should they strike again. *See id.* at 122–24. As such, the Supreme Court concluded that the corporations retained a sufficiently concrete interest for the district court to reach the merits of their declaratory judgment claim. *Id.*

Here, the Court reaches a similar conclusion. First, the Court finds Brown's claim for injunctive relief is now moot because the NTA is no longer regulating Brown's contract with Union Pacific. Second, like the corporations in *Super Tire Engineering*, Brown retains a legally cognizable interest in obtaining declaratory relief because of the on-going effect of the NTA's

1    regulatory scheme on Brown's ability to provide rail-crew transportation services in Nevada.

2    Brown maintains this interest notwithstanding the loss of its contract with Union Pacific because

3    the termination of Brown's contract does not end the NTA's assertion of authority over Brown's

4    rail-crew transportation services between two places in Nevada, much like the conclusion of the

5    strike in *Super Tire Engineering* did not end the state's policy of granting public benefits to

6    striking employees. The parties know that should Brown reenter the Nevada market, it will be

7    subject to the same regulatory challenges faced in this case. *See, e.g.*, *S. Pac. Terminal Co. v.*

8    *Interstate Commerce Comm'n*, 219 U.S. 498, 515 (1911). Indeed, the NTA has assured the Court

9    of such. (Dkt. #67, NTA's Opp'n to Brown's Mot. for Summ. J. 4:9–15.)

10           Moreover, Brown has a further concrete interest in receiving declaratory relief:

11   Garijo is currently suing Brown in state court because Brown performed its rail-crew

12   transportation services in Winnemucca and Washoe County. The judge in that case has threatened

13   to hold Brown in contempt unless it obtains a declaration from this Court that its operations in

14   Nevada were legal under its federal licensing. Moreover, this Court's determination in this case

15   will undoubtedly affect Garijo's claims for damages against Brown in the state-court litigation.

16           Consequently, because Brown retains a legally cognizable interest in its requested

17   relief, the Court finds Brown's declaratory-judgment claim is justiciable. However, Brown's claim

18   for injunctive relief is dismissed as moot.

19           **B. Declaratory Relief**

20           The Declaratory Judgment Act states: "In a case of actual controversy within its

21   jurisdiction … any court of the United States … may declare the rights and other legal relations of

22   any interested party seeking such declaration." 28 U.S.C. § 2201(a). The Declaratory Judgment

23   Act requires a court to make two threshold determinations before reaching the merits. First, a court

24   must determine whether the case is ripe. *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669

25   (9th Cir. 2004). Second, if the case is ripe, the court must analyze the factors set forth in *Brillhart*

26

AO 72
(Rev. 8/82)

1   *v. Excess Insurance Co.*, 316 U.S. 491 (1942), and its progeny to decide whether to exercise its

2   jurisdiction. *Id.*

3   **1. Ripeness**

4   The first requirement for declaratory relief is that the claim be ripe for review. *Am.*

5   *States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994). "Basically, the question in each case is

6   whether the facts alleged, under all the circumstances, show that there is a substantial controversy,

7   between parties having adverse legal interests, of sufficient immediacy and reality to warrant the

8   issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273

9   (1941). If the request for declaratory relief involves threatened governmental action, a plaintiff

10  need not expose itself to liability before bringing suit to challenge the  basis for the threat.

11  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007).

12  Here, Brown's declaratory-relief claim against the NTA involves much more than

13  threatened governmental action, though it also includes that. Brown operated in Nevada without

14  NTA authority from November 2007 to October 2008 because the state court retroactively revoked

15  its operating authority in Winnemucca and Washoe County. Thus, while a plaintiff need not

16  expose itself to liability before bringing a declaratory action, in this case, Brown presently faces

17  liability for operating without NTA authority. Moreover, the NTA has assured the Court that it will

18  regulate Brown again if Brown reenters the Nevada market, unless the Court issues the declaratory

19  judgment Brown seeks in this case. (Dkt. #67, NTA's Opp'n to Brown's Mot. for Summ. J.

20  4:9–15.) Given these circumstances, the Court concludes there is a substantial controversy

21  between Brown and the NTA that is of sufficient immediacy and reality as to warrant declaratory

22  relief. Accordingly, Brown's claim for declaratory relief is ripe, and the Court proceeds to evaluate

23  the *Brillhart* factors to determine whether to exercise its jurisdiction.

24  **2. *Brillhart* Factors**

25  If a court finds a claim for declaratory relief is ripe, it "must also be satisfied that

26  entertaining the action is appropriate." *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1223

15

1   (9th Cir. 1998). This determination is discretionary, but a court's discretion is not unfettered. *Id.* It

2   is guided by the *Brillhart* factors, which counsel courts to: (1) avoid needless determination of

3   state-law issues; (2) discourage litigants from using declaratory actions to forum shop; and (3)

4   avoid duplicative litigation. *Principal*, 394 F.3d at 672. "Essentially, the district court must

5   balance concerns of judicial administration, comity, and fairness to the litigants." *Kearns*, 15 F.3d

6   at 144 (quotations omitted).

7              In the circumstances of this case, the Court concludes it should exercise its

8   jurisdiction over Brown's declaratory-judgment claim. The Court finds none of the *Brillhart*

9   factors counsel against this decision. First, Brown's claim involves only a single federal issue:

10  whether its rail-crew transportation services are wholly in interstate commerce. Thus, there is no

11  danger of the Court entangling itself in state-law issues. Second, the Court finds no indication that

12  Brown is forum shopping. Instead, Brown first raised its claim with the Federal Motor Carrier

13  Safety Administration, but the Administration exercised its discretion and declined to issue a

14  declaratory ruling because it concluded Brown's claim was not of industry-wide significance. (*See*

15  Dkt. #66, Aff. of John Bickerstaff ¶ 52); *see also Serv. Storage & Transfer Co. v. Virginia*, 359

16  U.S. 171, 177 (1959) ("interpretations of federal certificates … should be made in the first instance

17  by the authority issuing the certificate"). And Brown and the NTA both agree that a declaratory

18  judgment from this Court is the proper vehicle to resolve their dispute. (*See* Dkt. #67, NTA's

19  Opp'n to Brown's Mot. for Summ. J. 5:11–15 ("Should this Honorable Court determine that the

20  matter is not moot, the NTA agrees with [Brown] that … [t]here exists a substantial controversy

21  between the parties … of sufficient immediacy to warrant the issuance of a declaratory

22  judgment.").) Lastly, the Court is not concerned about duplicative litigation. While this Court's

23  declaratory judgment will undoubtedly affect Garijo's state-court action against Brown, the judge

24  in that case explicitly told Brown to obtain a judgment elsewhere to support its contention that all

25  its rail-crew services are wholly in interstate commerce. (Dkt. #66, Aff. of John Bickerstaff ¶ 65.)

26

AO 72
(Rev. 8/82)

1    Accordingly, the Court concludes it is appropriate for it to exercise its jurisdiction and issue a

2    declaratory judgment in this case.

3    **C. Summary Judgment Standard**

4    Summary judgment is appropriate if "the pleadings, the discovery and disclosure

5    materials on file, and any affidavits show that there is no genuine issue as to any material fact and

6    that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant

7    bears the burden of showing that there are no genuine issues of material fact. *Id.* Once the movant

8    satisfies the requirements of Rule 56, the burden shifts to the party resisting the motion to "set

9    forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*,

10   477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving

11   party "must produce specific evidence, through affidavits or admissible discovery material, to

12   show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and

13   "must do more than simply show that there is some metaphysical doubt as to the material facts,"

14   *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

15   **D. Interstate Character of Brown's Services**

16   The Court finds it useful to begin by narrowing the issue for examination. The

17   record indicates that a certain percentage of Brown's trips cross state lines. Those trips are

18   undisputably interstate and no party suggests otherwise. A certain portion of Brown's trips,

19   however, are conducted solely between points and places in Nevada. Whether those trips make up

20   99% or 1% of the total of Brown's trips is irrelevant. Regardless of the percentage, the real

21   question before this Court is whether the character of those trips is such that they can be classified

22   as interstate notwithstanding they do not cross state lines.

23   The Court notes it does not begin with a blank slate. Numerous courts have

24   addressed the interstate character of motor-passenger transportation occurring wholly in one state.

25   The Court also takes note of the Nevada Transportation Authority's characterization of these cases

26   as "compelling" in Brown's favor. (Dkt. #67, NTA's Opp'n to Brown's Mot. for Summ. J. 7:5–8

("The NTA admits that the case law cited by Brown[] is compelling regarding the question as to whether interstate transportation of goods and services can contain a portion of that transportation, provided by an independent party, is intrastate in nature yet can still be classified as interstate due to the overall interstate nature of the transportation being provided.").)

**1. Existing Case Law**

In *United States v. Yellow Cab Co.*, the Supreme Court examined whether the transportation of passengers between railroad stations in Chicago was interstate for the purposes of the Sherman Act. 332 U.S. 218, 228 (1947), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). At that time, Chicago was the terminus of a large number of railroads. *Id.* Many passengers making interstate railroad trips had to disembark the train at one station, travel to another station located between two blocks and two miles away, and there board another train to continue their journeys. *Id.* The railroads contracted with a cab company to provide between-station transportation at no additional cost to the passenger. *Id.* In evaluating the interstate character of these services, the Court held:

> The transportation of such passengers and their luggage between stations in Chicago is clearly a part of the stream of interstate commerce. When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. That portion must be viewed in its relation to the entire journey rather than in isolation. So viewed, it is an integral step in the interstate movement.

*Id.* at 228–29 (internal quotations omitted). The Supreme Court also examined the general taxicab business in Chicago and held, in contrast, that between-station transportation that was not provided under contract with the railroads was "too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act." *Id.* at 230.

In *Pennsylvania Public Utility Commission v. United States*, the D.C. Circuit analyzed a similar situation involving the transportation of airline employees. 812 F.2d 8 (D.C. Cir. 1987). In that case, United Airlines contracted with Air Couriers International, Inc. ("ACI")

to transport its employees from Baltimore Washington Airport to a hotel in Columbia, Maryland and back again. *Id.* at 9. The Maryland Public Service Commission informed ACI that the service was intrastate and subject to state regulation. *Id.* ACI filed an application with the Commission to operate this service, but the application was opposed by an existing carrier and denied. *Id.* ACI then filed a petition with the Interstate Commerce Commission ("ICC")—the predecessor to the FMCSA—requesting a declaration that the service was interstate in character. *Id.* The Pennsylvania Public Utility Commission, among others, filed comments opposing the petition. *Id.* The ICC found "the transportation was interstate in character because it was provided pursuant to a 'common arrangement' between the air carrier and the motor carrier." *Id.* at 9–10.

The D.C. Circuit, relying extensively on the Supreme Court's *Yellow Cab* decision, upheld the ICC's determination. *Id.* at 10–12. It noted, (1) there was an explicit contract between United Airlines and ACI for the transportation of United's personnel; (2) ACI's services were not part of a regularly scheduled service for other paying passengers; and (3) ACI was not transporting passengers to a final destination within the state, rather, it only took them to temporary accommodations before returning them to the airport to continue their interstate journey. *Id.* at 11. Further, it found its decision consistent with the ICC's prior decisions in *Motor Transportation*, 95 M.C.C. 526 (1980) and *Kimball-Petition for Declaratory Order*, 131 M.C.C. 908 (1980). *Id.* In those cases, the ICC adopted the principle "that motor transportation between an airport and another point in the same state is 'interstate movement' where 'there is an arrangement (referred to a as a "common arrangement" or "through ticketing") between the motor carrier and the air carrier for continuous passage or interchange.'" *Id.* (quoting *Kimball*, 131 M.C.C. at 918).

In two other cases, the Third Circuit and the Fifth Circuit both considered whether prearranged passenger pickups from an airport to a vacation accommodation within the same state were interstate moves. *See Charter Limousine, Inc. v. Dade County Bd. of County Comm'rs*, 678 F.2d 586 (5th Cir. 1982); *Southerland v. St. Croix Taxicab Ass'n*, 315 F.2d 364 (3rd Cir. 1963). In both instances, the courts found the transportation was interstate because it was prearranged and

1  paid in advance and therefore constituted an integral part in the vacationers' overall interstate

2  journey. *See Charter Limousine*, 678 F.2d at 589; *Southerland*, 315 F.2d at 369.

3          Moreover, in two cases involving the same rail-crew transportation services at issue

4  in this case, the Northern District of Illinois and the Pennsylvania Public Utilities Commission

5  both found rail-crew transportation to be wholly within interstate commerce. *See Williams v.*

6  *Alex's Transp., Inc.*, 969 F. Supp. 1142 (N.D. Ill. 1997); *In re Renzenberger, Inc.*, 98 Pa. P.U.C.

7  87 (2003).

8                          **2. Analysis**

9          Based on its review of the cases and the undisputed facts concerning Brown's rail-

10  crew transportation, the Court finds Brown's rail-crew transportation services performed only in

11  Nevada are wholly in interstate commerce. The Court reaches this conclusion for two reasons.

12  First, Brown operates only under contract with an interstate rail carrier. It only transports rail crews

13  at the request of the railroad on a prearranged basis; it does not provide taxi services to the public.

14  Second, all of Brown's transportation services performed for the railroads are an integral part of

15  the overall operation of the trains' interstate journey. Whether it is assisting at a rail yard, moving

16  crews along a rail line, or transporting crews to stations or temporary accommodations, the

17  railroads request Brown's services for the same purpose: to keep the trains operating within the

18  requirements of federal law and union rules without undue delay. Consequently, the Court finds

19  that Brown's rail-crew transportation services are an integral part in interstate train movements and

20  therefore are wholly in interstate commerce.

21  //

22                          **CONCLUSION**

23          Accordingly, and for good cause appearing,

24          It is hereby ordered that Garijo's objection (Dkt. #60) is overruled. Magistrate

25  Judge Leavitt's January 12, 2009, order (Dkt. #56) is therefore affirmed.

26

AO 72
(Rev. 8/82)

It is further ordered that Brown's motion for summary judgment (Dkt. ##64 & 65) and Garijo's motion for summary judgment (Dkt. #69) are granted in part and denied in part as follows:

- The Court declares that Brown's rail-crew transportation services are wholly in interstate commerce and therefore subject exclusively to the Federal Motor Carrier Safety Administration's jurisdiction as to licensing under the Motor Carrier Act.
- The Court denies as moot Brown's request for injunctive relief.

The Clerk of the Court is directed to close the case.

Dated: May 1, 2009.

_____
ROGER L. HUNT
Chief United States District Judge

AO 72
(Rev. 8/82)